**DE VEAUX**

v.

**ROPNER SHIPPING CO., Limited.**

**THE DALEBY.**

No. 14847.

United States Court of Appeals, Fifth Circuit.

April 30, 1954.

William I. Brenner and Robert Golden, Miami Beach, Fla., for appellant.

Cody Fowler and Walter Humkey, Miami, Fla., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Appellant was an employee of Shaw Brothers Shipping Company, called Shaw Brothers, an independent stevedore engaged to unload the Motor Ship Daleby whose cargo, among other things, consisted of English type, light automobiles loaded 'tween decks in the upper half of rear hold No. 5. He charged both the unseaworthiness of the ship and negligence on the part of the officers and crew. The lower court found that he had been injured "while employed as a longshoreman or stevedore in unloading cargo from the respondent M/V Daleby"; (2) "his injuries resulted from the breaking of a board or boards covering the 'tween

deck hatch in No. 5"; he (3) "was employed by an independent stevedore"; (4) it "was not clear from the proof whether the board or boards were in a defective condition prior to the libelant beginning work on the vessel, or became defective during the unloading operation, either by reason of normal use in unloading or by act of the stevedores. On the basis of all the evidence, I hold that libelant has failed to prove by a preponderance of the evidence that the vessel was unseaworthy"; and (5) " * * * no negligence was proven (on the part of the vessel, her officers or crew) and as a matter of fact this theory of the case was not followed by the libelant on the trial of the case. Negligence was not an issue in the case as tried."

The court held that the libelant was "a seaman" and that the ship could "not defend by showing reasonable diligence, as the obligation is essentially a species of liability without fault and is neither limited by conception of negligence nor contractual in nature."

The 'tween deck consisted of the metal floor of the ship and a wooden hatch cover 28' x 30', which fitted flush with the metal. The cargo stored thereon was made up of the automobiles, some 22 in number, some of which were stored on the hatch cover and had to be unloaded by sling to make room for lifting the remainder out on a float with chains attached to the four corners. There was also a quantity of 90-lb. sacks of cement unloaded from this deck or compartment after the automobiles had been taken out.

Plaintiff's proof as to the circumstances of the alleged accident consisted of his own testimony and that of a fellow workman by the name of Robert H. Lee. The latter was called as the first witness and testified briefly as to what happened.[1]

On cross examination this witness said he had worked only a short while, identified certain photographs of the respondent as "looking like" the hold of the ship which they unloaded, but said they did not look like pictures of the Daleby. He could not name any other workers besides the libelant but went further into a description of where the latter was and how the accident happened.

The libelant gave his version of how the accident happened.[2] He stated that when he fell and was pulled out, his leg

1. Testimony of Robert H. Lee (R. 36)

"Q. Will you please describe in your own words what happened. A. Well, we had to push the cars to make room for the ramp, and in doing so—

"The Court: Keep your voice over this way.

"The Witness: We had to move the cars to make room for this thing that you lift them out with, and in doing so they told me to get in and steer it. The men were all around it. They were pushing it back, and this man slipped down between the hold—between one of those—I forget what they call them. There was an opening in there. He just fell down between there. So, when he fell I jumped out and some other guys come out and helped pull him up. So, I asked him if he was all right. He said yes, he was all right. He went and sat down for a few minutes, then he came back and started working on. His knee was bruised a little bit, but nobody thought very much of it; at least, we didn't.

"Mr. Fowler: He is just making a statement. He has told how it happened. That was the question.

"Q. (By Mr. Brenner) Did you see any hole in the hatchcover before the accident? A. No, sir, I didn't. I didn't pay any attention.

"Q. Did you see one after the accident? A. Well, we made preparations to remedy that so nobody else wouldn't fall in it.

"Q. What did you do? A. They closed up those cracks.

"Q. Were you subpoenaed to come here today? A. Yes, sir.

"Mr. Brenner: You may inquire."

2. Testimony of James A. DeVeaux. (R. 56)

"Q. While unloading these automobiles did anything unusual happen? A. Yes, sir.

"Q. What happened? A. I had an accident.

"Q. Will you please describe in your own words how the accident happened? A. Well, it is like I stated, we had a—I didn't state it. I am sorry for saying that. As we were pushing the cars from the east end—I mean, from the west end towards the east, I was right in front of the radiator, in front of the car, in the

had been scratched, was bleeding, and his trousers torn. He went to the cooler, drank some water, tied a string around his trouser leg and went back to work. He was then interrogated as to whether any report was made of the accident.[3] He further stated that although his legs "bothered him", he went back to work and continued, except for an hour for lunch, until the ship was finished "in the wee hours" Sunday morning.

The cargo in the lower part of the hold consisted of ten or fifteen pieces of glass and window frames packed in bundles of four; and a considerable quantity of 90-lb. sacks of cement. Libelant testified that he found pieces of "dunnage" in this lower section, claiming it was part of the hatch cover which had broken under him.

On cross examination he swore that there were two or three other longshoremen stationed at the sides of the automobile helping push it onto the hatch cover and that his position was immediately in

front of the radiator. Further that there were extra hatch cover planks on this deck which were put in place of those that broke when he fell.

The libel was filed a little more than a year after the alleged accident (July 7, 1951) on July 23, 1952.

Respondent's Evidence.

L. W. Spore, stevedore foreman for Shaw Brothers since 1943, testified that he supervised the unloading of the Daleby, and in contradiction of the statements of libelant and his witness, that the first he knew of the alleged accident was on Wednesday, July 11th; that DeVeaux put in full time both on the Daleby (9:30 a. m. to 3:00 a. m. Sunday, the 9th) and also worked in the complete unloading of an American vessel, the Ponce, starting about the same time Tuesday morning and finishing about 4:00 a. m. on Wednesday, the 11th. In corroboration of this witness's testimony there was offered in evidence the order given by

center, pushing with all my weight. As I gave a push like this (illustrating) I went down.

"Q. You went down where? A. I went down between the broken hatchcovers, the hatchboards.

"Q. Were there any holes or broken hatchboards noticeable to you before you fell? A. No, sir. I didn't notice them.

"Q. Did you notice any after you fell? A. Yes, sir, I did.

"Q. Do you know if anything was done to cover those holes? A. Yes, sir.

"Q. What was done? A. The header had the other men to remove them two out, put them on the side, and bring two new ones in their place.

"Q. Had you been in this hold from the time the unloading operations began that morning until the time of the accident? A. Yes, sir."

\*    \*    \*    \*    \*

"Q. After you fell through did you get up by your own power, by yourself? A. No, sir.

"Q. How did you get up out of the hold? A. Well, when I fell, like I stated I fell this way; I fell over like this (indicating), and Jimmie, Jimmie Lee, he jumped out and he grabbed me under the wing. There was somebody else there, but I don't remember who, because it happened too fast. When he pulled me up, by me bracing like this (illustrating),

I managed to get up, and they walked me over to the water bucket and they set me down.

"Q. How far into the hold did you fall? A. Well, the left knee here, it was wedged in like this (illustrating), just wedged in. The right leg was over enough for me to pull up on Jimmie. This right leg was like this here (illustrating).

"Q. When you were pulled up out of the hold, did you come up freely? A. No, sir.

"Q. What happened, if anything, to your left leg as you were being pulled up? A. As I was being pulled up, the way I was wedged so far in, this left leg here came out with splinters in it, with chips of wood, the size of about like that (indicating). They could have been longer."

3. Testimony of James A. DeVeaux. (R. 60)

"Q. Did you hear anybody report this accident? A. Yes, sir.

"Q. Who reported the accident? A. Samuel Morton reported the accident.

"Q. To whom did he report the accident? A. He reported the accident to Mr. Spore. (Foreman for Shaw Brothers.)

"Q. When did he report the accident to Mr. Spore? A. He reported the accident right away."

Spore as foreman to DeVeaux to see Shaw Brothers' doctor, William H. Ellis, and the latter's report, both dated July 11th. Although constantly in charge of unloading, he never saw or heard of any broken hatch boards.

John Kenny was Master of the Daleby from May 10, 1950, the year it was commissioned as a new vessel on the 27th of the same month. He was in charge when the alleged accident happened but never at any time heard of it until the papers were served. Kenny was the holder of a British Master's, Board of Trade Certificate, "Foreign Going, since 1919". After examining the First Officer's Log Book covering the period June 12th— July 13th, he testified that holds Nos. 2 and 5 had been unloaded at Miami, Florida, commencing at the hour stated above and finishing at 4:55 a. m. on Sunday, the 8th, the work proceeding continuously and that he had nothing to do with the employing of stevedore labor for unloading the ship. He and other officers were always present and were there to see that neither the ship nor its cargo were damaged; that during the unloading of the Daleby there was no report to him or any entry in the Log Book of such an injury to any workman; that in such instances report is usually made to the ship's Chief Officer and entered in the official log; that the Second and Third Officers in charge of unloading holds 5 and 2, respectively, were E. J. Middleton and N. A. H. Oates. The first time he heard of the accident was about November, 1952, when he was going on board about an hour before time of leaving Miami "when I was told a writ had been placed on the list" and that no report of damage to hatch covers was made on July 7th, 1951. He further testified that the Daleby was last surveyed prior to July 7th, 1951, on June 15th of that same year at Hull, England, in an inspection carried out by Lloyd's Surveyors, in his presence, which included particularly the hatches and was rated "100–A–1", the highest available.

On cross examination Kenny said that such a survey is usually made when the ship is empty, and in this instance was in dry dock; that these surveys are made once a year and the ship's officers "always see they are kept up to the standard required". If a defective hatch cover is noted he would order it replaced with extra covers carried aboard, sometimes amounting to a dozen and " * * * wood to make hatches" by the ship's carpenter. If a hatch cover became defective and were replaced it would not be entered in the ship's Log, unless there was an accident and someone was injured. There was a ship's officer present in the No. 5 hold while being unloaded; that he would not be replaced when he went to the men's room or lunch, unless the condition with respect to care of the cargo required, and his lunchtime would probably be the same as the stevedores. Further that hatch covers are in place over the hatches when an inspection is made such as that on June 14th or 15th; and that they bear the number of the hold in Roman figures with corresponding circles. The inspections were made to see that the ship is seaworthy but not the hatches except to see that they are watertight.

In addition to the inspection by the Board of Trade in England, they have what is called the Factory Act Inspection under which an inspector "comes round and there is a record kept of all the machinery connected with the discharging and unloading of the ship, and it is his job to see that it is kept in perfect condition"; that from the time they sailed from England until arrival in Miami on July 7th, the vessel was "under constant inspection to see that the hatches are properly secured and kept that way"; that the hatch covers were inspected before the vessel went to sea, and the tarpaulins were not removed until unloading began, including those over the 'tween deck hatch.

Charles S. Newton testified by deposition that he was a ship's engineer employed by Lloyd's Register of Shipping and made a survey of the Daleby at Hull, England; that there are "two surveys, the annual dry dock survey and the load

line survey"; that this included the hatch covers, "every one of them"; and no repairs were necessary. He had to walk over them in the inspection and found nothing wrong with them; that none of them were rotten on the 14th of June, 1951, and the vessel was about one year old at that time.

William James Brown, who went aboard at Hartlepool, England, was the ship's carpenter on board the Daleby, beginning December 20, 1950, and continued to November 17, 1952; that it was his duty to look after the condition of the hatch covers; and that all covers on this ship were of uniform dimensions, 5' 10" x 18" 2¾". He further testified as indicated in footnote.[4]

Edgar Austin Snaith had been the Chief Officer of the Daleby for about eighteen months when his testimony was taken December 11, 1952. He also identified Lloyd's Load Line Certificate of the Daleby issued in 1950, stating that all regulations of safety devices on the ship had been observed, that such a certificate had again been issued in 1951 and that these certificates are kept at all times in the chartroom of the ship. Such a certificate would be cancelled if the ship was not kept in the proper condition of safety for the "protection" of all concerned. He further testified he was present during the inspection by Newton on June 15th and on the job in Miami in July, 1951. In the inspection by Newton each plank of the hatch covers was examined separately, and otherwise he supported the testimony given in the deposition of the ship's Master, John Kenny, including the construction, sizes, etc., of the boards covering the 'tween deck hatch and that they were 9" wide, 3" thick and were bound together on each end by steel bands making them 18" wide altogether. He further gave the names of the officers in charge of the unloading of holds 5 and 2 as stated above. No report of any accident was made to him except a slight damage to a fender of one of the automobiles; that after unloading at Miami, the ship went to New Orleans and Houston and there were no reports of damage to any of the hatch covers at either point. He was in charge of inspections which were

---

4. Testimony of Williams James Brown. (R. 185)

"Q. Did you have occasion to repair or replace any hatch covers in the month of July, 1951? A. No, I do no think I replaced any. They were all practically brand new.

"Q. Was the ship a new vessel? A. Yes.

"Q. Had she sailed at all before you joined her? A. Two voyages before I joined her.

"Q. Do you remember the vessel putting into Miami? A. Yes.

"Q. Do you remember when it was? A. Oh, no, I do not remember the date.

"Q. Do you remember the vessel going into Miami in July, 1951? A. I think that was the first time I went with the ship to Miami.

"Q. Did you hear of any accident on this ship while you were in Miami on this occasion? A. No.

"Q. On the occasion of that visit to Miami, did you have occasion to mend or replace any of the hatch covers? A. No, sir."

\* \* \* \* \*

"Q. Do you think any of the planks in the hatch covers were rotten in July, 1951? A. No, sir, they were all brand new.

"Q. Were there any hatch covers broken on that voyage in the course of which you went into Miami in 1951? A. No, sir."

\* \* \* \* \*

"Q. If one had laid the plank aside as broken or defective in that way, would someone have had to find a new one to replace it? A. Yes.

"Q. Whose duty would it have been to find a plank in replacement? A. It was mine.

"Q. Did you ever hear in Miami in July, 1951, of any hatch plank requiring to be replaced? A. No, sir.

"Q. When hatches are covered and battened, have you any duties in connection with them? A. Yes, I batten the hatches.

"Q. Did you batten the hatches down on the completion of the voyage at Miami in July, 1951? A. Yes.

"Q. Was there anything wrong with any of them on that occasion? A. I do not remember."

also made before loading and after unloading which was done on this voyage and no damaged hatch covers were found. On the return trip they carried wheat, starch and carbon black in the 'tween decks and that there were 22 automobiles in hold No. 5 when unloaded at Miami.

On cross-examination, Snaith testified that sometimes the hatch covers have to be replaced, "if you drop something very heavy on them they would become broken." Altogether there were fourteen extra hatch covers carried on board to replace any that might be damaged; that it takes above 60 boards to make up a hatch cover and that the last time he had been informed that a hatch board was replaced was in June, 1952. He was always informed when this was done. Such replacements are not entered in the Log and he did not recall any being replaced at the time mentioned.

While the lower court found that the appellant was injured by falling through the hatch boards covering 'tween deck hatch No. 5, the sole testimony as to how this happened was that of the libelant and his fellow stevedore, Lee, although each testified that there were three or four other witnesses present at the time. Lee's statements are not at all impressive. DeVeaux undoubtedly received injury in some way, as disclosed by the doctor who examined him some four days later, after he had helped finish unloading of the Daleby as well as the complete unloading of another vessel, the Ponce, on July 11th. Both witnesses were completely contradicted in their statements of having reported the accident to Spore, foreman for Shaw Brothers, and no other officer or employee of that company was shown to have known about it until appellant reported to Spore on the morning of July 11th. There is every reason to believe, from the record as a whole, that, had the accident happened as appellant and his witness testified, someone else and especially the stevedore foreman in charge would have been aware of it. As stated earlier, respondent knew nothing about the alleged accident until the libel was served more than a year later, when there was no opportunity whatever to investigate the matter. To allow recovery under such circumstances would make it very easy for such a claimant to establish almost any kind of a claim of injury, whether actually received in the manner claimed here or not. Since there was no other evidence of how the injury was caused, the lower judge accepted the statements of plaintiff's witnesses but in view of the overwhelming evidence of respondent showing seaworthiness, concluded that if there was any defect in the hatch covers, it had been caused by something done after the stevedore took charge and not because they were in that condition when the latter took over. In other words, as the court below said, the appellant simply failed to prove his case.

There is an apparent inconsistency in the lower court's findings of fact, in that while plaintiff had failed to prove unseaworthiness of the ship, nevertheless "his injuries resulted from the breaking of a board or boards covering the 'tween deck hatch in hold No. 5". The respondent's liability did not arise from negligence or the lack of diligence to insure seaworthiness. The Supreme Court in Alaska Steamship Co. v. Petterson, 74 S.Ct. 601, 605, affirmed by per curiam the Ninth Circuit Court of Appeals in the same case, 205 F.2d 478. The facts, though not clear, were held to show that a defective snatch block brought aboard by the stevedore, broke causing Petterson's injuries. The Court of Appeals for the Ninth Circuit held this sufficient to render the ship owner liable, stating the issue as follows:

"The question presented is whether a vessel's owner is liable for injuries received by an employee of a stevedoring company (an independent contractor) on board ship while engaged in the loading of the ship where the injuries are caused by a breaking block brought on board by the stevedoring company."

In a dissenting opinion by Mr. Justice Burton, concurred in by Justices Frankfurter and Jackson, the nature of the

Petterson case was discussed, the authorities reviewed and the suggestion made that such an "extension of liability which it introduced should be left to legislative initiative".

We feel that in the present case we should find the facts anew. Accordingly, we hold that the libelant not only failed to prove he was injured while working on the Daleby but that the believable evidence preponderates strongly against that conclusion. Some four days elapsed after the alleged injury and no one was shown to have any knowledge of it except DeVeaux and his witness, Lee. Their statements were highly improbable in the light of the presence and testimony of many other witnesses. They were squarely contradicted by a number, some of them without interest, who, if it had happened as libelant contends, would certainly have known about it.

We, therefore, feel impelled to find as a matter of fact that appellant has failed to prove that his injuries were suffered aboard his ship and on this basis the judgment of the lower court is

Affirmed.